IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
INTELLIGENT PAYMENT PROCESSING :
     INC. :
     :
     Plaintiff, :
     :
v. :    Civil Action No. _____
     :
     : **PLAINTIFF'S COMPLAINT**
UPTEMPO MARKETING CORP. :
     f/k/a Tempo Marketing Corp., : **JURY TRIAL DEMANDED**
UPTEMPO SERVICING CORP. :
     f/k/a Tempo Servicing Corp., :
UPTEMPO, INC. :
     f/k/a 10588164 Canada Corp., :
     :
-and- :
     :
HANK PAYMENTS CORP. f/k/a :
     The Card Collaborative :
     International Corp. f/k/a :
     The Card Collaborative :
     International, LLC, :
     :
     Defendants. :
-------------------------------------------------------x

     Plaintiff, Intelligent Payment Processing, Inc. ("Plaintiff"), by counsel, files the

following Complaint against defendants, Uptempo Marketing Corp. f/k/a Tempo

Marketing Corp. ("UMC"), Uptempo Servicing Corp. f/k/a Tempo Servicing Corp.

("USC"), Uptempo, Inc. f/k/a 10588164 Canada Corp. ("Uptempo"), and Hank Payments

Corp. f/k/a The Card Collaborative International Corp. f/k/a The Card Collaborative

International, LLC ("Hank" or "TCCI"), jointly and severally.

     Plaintiff seeks (a) compensatory damages and punitive damages in the sum of

**$15,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury

from April 30, 2018 to the date Judgment is entered pursuant to New York Civil Practice Law and Rules ("CPLR") § 5001, (c) reasonable attorneys' fees, and (d) court costs – arising out of the Defendants' breach of contract, breach of guaranty, tortious interference with contract and business expectancies, conversion, and fraudulent conveyances in violation of New York Debt. & Cred. Law ("DCL") §§ 273, 274 and 276.  Plaintiff also seeks declaratory and injunctive relief to stop Defendants from fraudulently transferring the assets and business of UMC to Hank.

## I.  <u>NATURE OF THE ACTION</u>

1.      This is a case about broken promises, theft and fraud.

2.      Plaintiff is the owner and holder of a promissory note and unconditional guaranty signed by UMC and Uptempo, and is the beneficiary of perfected security interests in all the assets of UMC.  Copies of the note/guaranty, security agreement and recorded UCC-1s are attached as *Exhibits "A", "B", "C" and "D"*.

3.      Beginning in February 2020 and continuing through the present, as part of a brazen scheme to wrest beneficial ownership and control of Uptempo from Plaintiff and misappropriate the valuable assets and business of UMC, Defendants, acting in concert together and with others, unlawfully prevented performance of the note by UMC, interfered with the business of UMC and converted Plaintiff's security interests and property rights.  The Defendants unlawfully changed the location of UMC's bank accounts, transferred UMC's assets to accounts they control, set up a dummy corporation (Hank) to facilitate theft of UMC's entire business, and refused Plaintiff's lawful requests for access to its security, all in order to hinder, delay and defraud Plaintiff.

4.     Plaintiff brings this action (a) to recover the sums due and payable under the note, guaranty and security agreement, (b) to recover compensatory and punitive damages from the Defendants as a result of their tortious interference with contract, conversion of Plaintiff's UCC security interests, and fraudulent transfers, and (c) to obtain declaratory and injunctive relief to restore the status quo and to prevent the misappropriate and dissipation of UMC's assets.

## II.  JURISDICTION AND VENUE

5.     The United States District Court for the Southern District of New York has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and § 1391(b)(2).  All Defendants are subject to personal jurisdiction in New York.  A substantial part of the events giving rise to the claims stated in this action occurred in the Southern District of New York.  The note/guaranty at issue [*Ex. A*] contains a forum selection clause that requires this action to be filed in New York.  In the note, UMC and Uptempo irrevocably and unconditionally consented and submitted to personal jurisdiction in New York and waived any objection of *forum non conveniens*.

## III.  PARTIES

### *Plaintiff*

7.     Plaintiff is a New York corporation with a principal place of business in New York.  Plaintiff's President and CEO is Michael C. Trimarco ("Trimarco").

**_Defendants_**

8.      Defendant, UMC, is a Delaware corporation.   UMC is controlled and operated by Uptempo from an office located in Toronto, Canada.

9.      Defendant, USC, is a Delaware corporation.   USC is controlled and operated by Uptempo from an office located in Toronto, Canada.

10.      Defendant, Uptempo, is a Canadian corporation with a principal place of business in Toronto, Canada.

11.      Defendant, Hank, is a Florida corporation with a principal place of business in Florida.  Hank is an alter ego, dummy and stooge of Uptempo.  Hank was created and is being operated by Uptempo to perpetuate fraud on Plaintiff and to convert the assets and business of UMC.  "Hank" is a shell.  On April 12, 2018, Uptempo and USC entered into a Share Purchase Agreement with The Card Collaborative International, LLC ("TCCI"),[1] Shawn P. Carden ("Carden") and his wife, Heather Carden, pursuant to which Uptempo purchased all the membership interests ("Units") of TCCI.  Uptempo paid $1,598,000 for the TCCI Units by issuing a $1,500,000 promissory note, $500,000 worth of common shares of Uptempo, and by paying $48,000 in cash to Carden.[2]  On August 12, 2020, in furtherance of Defendants' scheme to convert the assets

---

[1]      Prior to April 12, 2018, TCCI was engaged in the business of a shared services and support organization assuming the role of program manager on behalf of IPPI.  TCCI engaged directly with issuing banks, processors and others fulfillment providers on behalf of IPPI.  Under the Share Purchase Agreement, it was contemplated that Uptempo would transfer the Units to USC ("Subco"), and USC would, thereafter, become the servicing agent and payment/transaction processor for UMC.  Plaintiff does not know whether this transfer ever occurred.

[2]      In the TCCI Share Purchase Agreement, Uptempo represented that it had "immediately available funds in cash" and other resources available to pay the purchase price.  This was an untrue statement.

of UMC (Plaintiff's Collateral), Uptempo converted TCCI from a limited liability company into a corporation called, "The Card Collaborative International Corp."  On January 11, 2021, The Card Collaborative International Corp. changed its name to "Hank Payments Corp."  The entity and name changes were all concealed from Plaintiff.

### *Defendants' Agents*

12.     Michael T. Farley ("Farley") is a Rhode Island lawyer.  At all times relevant to this action, Farley acted as "general counsel" for UMC and Uptempo.

13.     Michael Hilmer ("Hilmer") is a citizen of Canada.  At all times relevant to this action, Hilmer acted as CEO and President and otherwise controlled the management and operations of all the corporate Defendants.

14.     Chris Cicolini ("Cicolini") is a citizen of Maryland.  At all times relevant to this action, Cicolini was a director of Uptempo and UMC.

15.     Carden is a citizen of Florida.  At all times relevant to this action, Carden was a director of TCCI.

## IV.   STATEMENT OF THE FACTS

16.     IPPI owned a fee-based, consumer budgeting tool that facilitated the payment of auto loans.  Consumers signed up for the service through IPPI's clients – auto dealers – at the point of purchase of financed new and used cars.  IPPI placed customers on a real banking platform that provided FDIC insurance on individual accounts, which cut delinquency and default rates on average by about half.  IPPI engaged in approximately $500,000,000.00 in transactions per year.  IPPI's products and services provided consumers with piece of mind, and generated substantial recurring revenue.

The strategic deal interest in IPPI among lenders, financial advisors and others and was very strong.

17. Uptempo was formed on January 18, 2018 and UMC was formed on March 14, 2018. Uptempo and UMC were incorporated for the sole purpose of purchasing the business of IPPI.

**A.** ***The Note, Guaranty and General Security Agreement***

18. On April 12, 2018, Plaintiff, Trimarco, Melrose Ventures, LLC ("Melrose"),[3] Uptempo and UMC executed an Asset Purchase Agreement ("APA") pursuant to which UMC purchased the assets of Plaintiff for $5,000,000.00.

19. The APA and the Share Purchase Agreement between Uptempo, USC and TCCI are part of a fully-integrated triangular merger agreement in which the entire business of IPPI was merged into Uptempo.[4]

20. At closing, UMC and Uptempo paid the purchase price under the APA as follows: (1) Uptempo paid Plaintiff $3,000,000.00 by way of issuance of a specified percentage of its common shares, and (2) UMC paid Plaintiff $2,000,000.00 by way of a Promissory Note (the "Note") guaranteed by Uptempo and secured by all the assets and property of UMC.

21. UMC agreed to pay the Principal Amount of the Note ($2,000,000.00) in installments as follows: $200,000 on the date that was 90 days following April 30, 2018, and $100,000 on each date that was 90 days following the first payment. The Principal

---

[3]     Melrose is a Florida limited liability company controlled by Trimarco. Melrose is the majority owner of Plaintiff.

[4]     As part of the integrated contract, the parties agreed that Trimarco, the direct beneficial owner of IPPI, would be included as a signatory on the companies' banking resolutions.

Amount of the Note bears interest at a rate of six percent (6%) per year.  All accrued and unpaid interest was due on a monthly basis, beginning on May 5, 2018 and on the 5th day of each month thereafter until the Principal Amount was paid in full.

22.     The obligations of UMC under the Note are secured by a General Security Agreement ("GSA") over all the assets and property of UMC, including the following collateral (the "Collateral"):

> (a)     "*Collateral*" means, collectively, the following assets, wherever located, whether now owned or hereafter acquired or now existing or hereafter arising or accruing: (i) all of Debtor's Inventory, Accounts, Equipment, Fixtures, Investment Property, Deposit Accounts, General Intangibles, Documents, Instruments, Chattel Paper, Commercial Tort Claims, Letter-of-Credit Rights, Supporting Obligations, money and other personal property and (ii) all Products and Proceeds of the foregoing.

23.     UCC financing statements were filed in Delaware and New York in May 2018 perfecting Plaintiff's security interests.  At all times relevant to this action, the Defendants each had actual knowledge of Plaintiff's rights and security interests in UMC's assets.  For instance, UMC and Uptempo (by and through Hilmer) signed the Note and GSA:

> IN WITNESS WHEREOF, the undersigned has executed this Note as of the day and year first set forth above.
>
> **TEMPO MARKETING CORP.**
>
> By:
> Name: *Michael Hilmer*
> Title: *Director*
>
> **ACKNOWLEDGED AND ACCEPTED BY:**
>
> **UPTEMPO INC.**
>
> By:
> Name: *Michael Hilmer*
> Title: *Director*

IN WITNESS WHEREOF, Debtor has caused this Agreement to be executed by its duly authorized representative and delivered to Secured Party as of the date and year first above written.

**Debtor**              :              **TEMPO MARKETING CORP.**

By: _____

Name: _Michael Hilmer._____

Title: _Director_____

24.     Upon the occurrence of an Event of Default under the Note, Plaintiff has the right to declare the entire principal amount outstanding due and payable within thirty (30) days of notice being delivered to UMC.  The GSA provides that Plaintiff may pursue "any right or remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce or satisfy" the obligations then owing.  Among its concurrent remedies, Plaintiff has the right (1) to take possession of any of the Collateral if not already in its possession without demand and without legal process, and (2) with or without taking possession, to sell or otherwise dispose of any of the Collateral at public or private sale in accordance with the UCC.

25.     Section 3(e) of the GSA includes the following express covenants:

(e)     *Debtor's Other Covenants.*   Debtor (i) will preserve its existence, (ii)  will not, in one transaction or a series of related transactions, participate in any merger, consolidation or similar transaction, or sell or otherwise transfer any of its assets, if such merger, consolidation or similar transaction, or transfer, has the effect of materially and adversely affecting the Collateral or its value or its existence, or impairs or materially and adversely affects Debtor's ability to meet existing and future Obligations, (iii)  will not change the state of its incorporation or organization, (iv)  will not, without the prior written consent of the Secured Party not to be unreasonably withheld, change the location of any of the Collateral, (v)  will not, change its legal name or business structure without notifying the Secured Party in writing, (vi)  will conduct its business and use and maintain the Collateral in compliance with this Agreement and in material compliance with all applicable laws, (vii)   will maintain all-risk property insurance covering its assets reasonably satisfactory to Secured Party, naming Secured Party as lender's loss payee or the equivalent and entitling Secured Party to at least 30 days' prior written notice of policy cancellation or non-renewal, and provide evidence of such insurance to Secured Party upon request and (viii)  will immediately notify Secured Party in writing of (A) any loss, theft or destruction of or damage to, or any demand, claim, counterclaim, setoff or defense affecting, any of the Collateral,(B) any change regarding any information contained in Section 4 hereof or in  the Schedule and (C) the occurrence or existence of any Event of Default.

26.     Section 7 of the GSA expressly provides as follows:

> 7.   *Power of Attorney.*  Debtor irrevocably and unconditionally appoints Secured Party as the attorney-in-fact of Debtor, with full power of substitution and revocation, to take, at the sole option of Secured Party, in the name and on behalf of Debtor or otherwise, upon the security interest granted herein becoming enforceable in accordance with Section 6 hereof, each action relating to any of the Collateral that Debtor could take. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of Secured Party.

27.     All of UMC's payment obligations under the Note are "unconditionally" guaranteed by Uptempo (the "Unconditional Guaranty").[5]

28.     The Note specifies that upon the occurrence of an Event of Default, UMC "hereby agrees to pay all reasonable costs of collection, including reasonable attorneys' fees, incurred by Holder, whether or not suit is filed thereon."   The GSA contains a similar attorneys' fee provision.

**B.     *UMC and Uptempo Defaulted***

29.     Prior to April 8, 2020, multiple Events of Default and cross-defaults occurred under the Note and GSA.  The defaults and cross-defaults were well-known to UMC, Uptempo, TCCI, Farley, Hilmer, Cicolini and Carden.

30.     By letter dated April 8, 2020 delivered to UMC and Uptempo, Plaintiff declared the entire Principal Amount outstanding on the Note due and payable within thirty (30) days, and demanded access to and possession of the Collateral.   Plaintiff delivered a second written notice on October 28, 2020.

31.     UMC refused to pay the accelerated debt.

32.     Uptempo refused to honor its Unconditional Guaranty.

---

[5]     At all times relevant to this action, Defendants had a clear and present motive to interfere with Plaintiff's contracts, to convert Plaintiff's security interests, and to fraudulent transfer the assets of UMC and Uptempo so as to prevent performance and enforcement of the Note, Unconditional Guaranty and GSA and to interfere with Plaintiff's rights and interests as a shareholder of Uptempo.

**C.**     ***Defendants' Tortious Interference, Conversion and Fraud***

33.     Instead of paying the debt owed to Plaintiff, Defendants embarked on a scheme to hinder, delay and defraud Plaintiff and obstruct Plaintiff's broad collection rights under the Note and GSA.

34.     Uptempo, TSC and Hank/TCCI (collectively the "Uptempo Defendants"), acting upon direction from Farley, Hilmer, Cicolini and Carden, combined, associated, agreed and acted in concert to orchestrate a scheme or artifice that was calculated to prevent performance of the Note by UMC, impair the value of Plaintiff's Collateral, abrogate Plaintiff's security interests in UMC's assets, and deprive Plaintiff of lawful possession of UMC's monies and property.

35.     Beginning in February 2020 and continuing through the present, at times when they were on notice of UMC and Uptempo's breaches of the Note and Unconditional Guaranty, the Uptempo Defendants discussed via telephone and email and agreed upon a plan to interfere with, impair and abrogate Plaintiff's contractual rights and security interests.  The Uptempo Defendants took the following action as part of the scheme to injure Plaintiff's rights and interests:

        a.     In February/March 2020, as a first step towards conversion of Plaintiff's security interest in the Collateral, the Uptempo Defendants unlawfully removed Trimarco as an officer and director of UMC.  Pursuant to the APA, Trimarco became UMC's Executive Vice-President for Business Development.  Section 9.5 of the APA provides as follows:

9.5     Michael Trimarco Employment Agreement. Parent, Buyer and Seller agree to the following with respect to the Mike Trimarco ("Trimarco") Employment Agreement:

(a)     Within 90 days of the Closing Date, Buyer shall enter into an Employment Agreement or Independent Contractor Agreement with Michael Trimarco, which shall include the following material terms: (i) Trimarco's title shall be "Executive Vice-President for Business and Corporate Development", (ii) Trimarco will be paid for services rendered a base salary or contracted rate of TWENTY-EIGHT THOUSAND FIVE HUNDRED USD PER MONTH ($28,500USD/month) commencing on the Closing Date, (iii) Trimarco shall not be required to relocate to the New York City area to perform his duties, and (b) The general terms and conditions of said Trimarco agreement shall be agreed upon by both Trimarco and Buyer or Parent, as applicable, and shall have terms that are substantially similar to or the equivalent of the employment terms of any executive vice-president, chief operating officer or other executive of the Parent or Buyer that is of similar rank to Trimarco and that is employed in similar circumstances."

Trimarco was also elected to the board of directors of both UMC and Uptempo.

Corporate resolutions of UMC, signed by Hilmer on March 14, 2018, state as follows:

| Election of Directors | **RESOLVED**, that Mike Hilmer, Jason Ewart, Chris Cicolini and Mike Trimarco be, and hereby are, elected as directors of the Corporation to hold office until the next annual meeting of stockholders and until their successors have been duly elected and have qualified, or until their earlier removal, resignation or death. |
|---|---|

Section § 7.3 of the APA provides as follows:

7.3     Board Appointments.  Parent shall, and where applicable shall cause its principals to make the following elections and appointments:

(a)     Board of Directors of Parent: Upon Closing Michael Trimarco shall be elected to the board of directors of Parent, and shall hold this position until such time as (i) the board of directors of Parent has approved a transaction by which shares of the Parent are listed on a recognized stock exchange and (ii) the Parent  has raised a total of $2,000,000USD by way of a debt or equity financing. Seller shall cause Michael Trimarco to execute a resignation when the foregoing conditions are met;

(b)     Board of Directors of Buyer and Tempo Servicing Corp.: Post-closing board of directors of Buyer and Tempo Servicing Corp. (as wholly-owned subsidiaries of Parent) shall be Jason Ewart, Michael Hilmer, Michael Trimarco and Chris Cicolini.

Parent shall hold or cause to be held all meetings, and pass or cause to be passed all resolutions and shall take such further actions as may be reasonably necessary to give effect to the elections and appointments set forth in this Section 7.3.

The removal of Trimarco clearly violated the APA and Share Purchase Agreement, and Delaware law.[6]  The Uptempo Defendants removed Trimarco because they did not want Plaintiff to have knowledge of their actions and they wanted to impede Trimarco and Plaintiff's ability to protect the Collateral and Plaintiff's security interests.

      b.      Beginning in February 2020, the Uptempo Defendants notified UMC's bankers, Metropolitan Commercial Bank ("MCB") and T.D. Bank, N.A. ("TD"), that Trimarco had been terminated and that the Banks should cease and desist doing business with Trimarco  As part of the concert plan to interfere with the GSA and Plaintiff's security interest in the Collateral, the Uptempo Defendants savagely and repeatedly defamed Trimarco to the Banks and others, falsely accusing him of multiple federal and state crimes, sundry breaches of fiduciary duty, defalcations, and acts of dishonesty.  The Uptempo Defendants published the following false and defamatory statements of or concerning Trimarco in furtherance the scheme:

| Statement | Published By | Date |
|---|---|---|
| "given certain recent unauthorized banking activities of the Company's wholly owned subsidiary by Trimarco … Uptempo plans to execute a shareholder resolution … to reduce the number of Board members to three and to make changes to the Board" | Hilmer | 02/26/2020 |
| "one or more ACH debit entry(ies) were charged to their Account No. XXXXXX3355 on 02/13/2020 in the amount(s) of: (1) 11553.00 (2) 26297.69 … and that the debit(s) was/were unauthorized or improper … Customer did not authorize MICHAEL TRIMARCO … to debit their account at TD Bank" | Cicolini | 03/03/2020 |

---

[6]     In July 2020, a Delaware Chancery Court declared the Uptempo Defendants' actions unlawful and void.

| | | |
|---|---|---|
| "you are directed to Cease and Desist from using and or misappropriating Company funds to pay your personal debts or those of your family … Your destructive behavior is in violation of US and Canadian civil and criminal law, and has caused damage to Uptempo and its subsidiaries … Specifically, you have done the following actions with the purpose of attempting to undermine or destabilize the Company: …" | Farley | 03/20/2020 |
| "[a] You diverted Company funds by taking control of bank accounts illegally, to pay your own personal debts and/or credit cards … [b] You attempted to divert $83,000 in operating cash from subsidiary accounts into fake operating bank accounts you setup and controlled on January 16, 2020 … "[c] You made a second attempt to use subsidiary bank accounts to pay your personal American Express credit card and stop payments of bills being paid by the company … [d] You used Company funds to pay your wife's rent … [e] You have fraudulently claimed to be a subsidiary board member and/or executive, since your termination and you have been in direct communications with dealers, vendors, customers, clients, channels, affiliates, banks, employees and/or contractors … [f] You attempted to abscond with Company payroll funds from a subsidiary bank account using forged bank letters and/or forged corporate authorizations … [g] You have falsely claimed to be a Founder of Uptempo on social media and business media, including but not limited to Linkedln … [h] You committed fraud in Florida and in Delaware by attempting to change the registered agent for service for the company subsidiaries …" | Farley | 03/20/2020 |
| "[i] You attempted to control and manipulate private equity opportunities, specifically destroying a private investment relationship through a lack of professionalism, defamation and outright fraud … [j] You have begun issuing public-facing statements to partners, employees, contractors and/or affiliates of the Company alleging (falsely) that the Company leadership are 'con-men' causing reputational damage … | Farley | 03/20/2020 |

| | | |
|---|---|---|
| [k] You demanded that the companies apply for US bailout payments for which the Canadian-owned entities would likely not be eligible in an effort to get access to private company information that you are not otherwise entitled to due to your egregious behavior AND that you have demonstrated you will not protect in accordance with Director level confidentiality requirements … [l] You have shown up (unwanted) at the private residence of a company employee openly disparaging company management and engaging in harassing and hostile telephone communications with the employee and his family in a scheme similar to that which you apparently used to obtain control of a prior business entity … [m] Your actions are in violation of criminal and civil law in Florida, Delaware and New York, as well as in Canada" | Farley | 03/20/2020 |
| "Since our last communication, Mr. Trimarco has continued to harass our vendors and affiliates … Mr. Trimarco has also been served with two Notices of Indemnification based upon his frauds, misrepresentations, and general failure to abide by the terms of the Asset Purchase Agreement.  We have preserved our rights to indemnification and have locked up relevant consideration until the matter is resolved between the parties … the current ownership structure of IPPI has been concealed from us … In addition, Mr.    Trimarco is a noteholder of Uptempo, Inc., but the note is impaired by certain frauds and  misrepresentations, as described in the Notices of Indemnification mentioned above.  We expect our indemnification claim, together with locking up income and other potential payments will in time bring the Trimarco group to the table to discuss an appropriate resolution … we remain vigilant in our management of the situation and continue to engage with law enforcement … We would not object to you contacting law enforcement as well to register the issue.  Thus far, we have stayed ahead of him and protected the assets of the corporation" | Farley Hilmer Cicolini | 04/16/2020 |
| "We have been the victim of corporate identity theft, and require your assistance with our accounts at TD Bank … Please also forward this to your fraud department, in the event he has applied for federal disaster funding through TD Bank" | Farley Hilmer Cicolini | 04/16/2020 |

| | | |
|---|---|---|
| "It is our position that your client has committed acts of fraud and theft dating back to 2018.  These acts are not quite as egregious as those alleged against Vincent Trimarco in the Eastern District of NY, but they are similar" | Farley | 04/18/2020 |
| "Your client was terminated from Uptempo, and later removed as a board member on 2/26.  You and he have been served with Notices to Cease and Desist, as well as Indemnification Notices.  In addition, we have served you with a notice to preserve all evidence based upon the email you sent to Gene Biegelman asking for his assistance in one very specific fraud" | Farley | 04/18/2020 |
| "This is a matter of fraud and theft alleged against Michael Trimarco.  In this matter, we have been informed that Vincent Trimarco has taken action in furtherance of the fraud we have alleged against Michael Trimarco" | Farley | 04/20/2020 |
| "just wanted to follow up on our conversation yesterday regarding the fraudulent PPP application(s) made at TD Bank … To recap, we understand that at least one application was made for Uptempo Marketing Corp by Michael Trimarco at TD Bank.  We understand that the Uptempo Marketing application was approved and funded, but that those funds were not distributed based upon our complaints to SBA/FBI/TD Bank … As we also explained, over the last several years, Mr. Trimarco has been accused of misappropriating company assets for other company assets and converting them to his own personal use … We believe that he is doing the same thing with our companies using the PPP program.  The impact of these fraudulent applications upon our company could become catastrophic" | Farley | 05/07/2020 |
| "Fraudulent Changes to Our Account … We believe that the individuals responsible for these fraudulent changes may be Michael Trimarco and/or Eugene Beigelman.  Trimarco was terminated in or about February, and Beigelman was terminated in late March or April.  Neither individual was changes to make changes to our account.  This fraudulent activity is consistent with Trimarco's actions pertaining to other Uptempo vendors" | Farley Hilmer Cicolini | 05/08/2020 |

| | | |
|---|---|---|
| "Since Mr. Trimarco's termination and board removal, he has 'pretended' to own the Uptempo companies … Most troubling of all are the allegations against Mr. Trimarco in the <u>Intellipayment v Trimarco</u> New York lawsuit, wherein it is alleged that: he had Pete Vogel create a company called Intelligent Payment, then Trimarco stole all of the assets of 'Intellipayment' and put them into 'Intelligent Payment,' hoping that no one would notice – but thereby defrauding the shareholders and creditors of Intellipayment.  It is obvious that Mr. Trimarco has tried to do the same thing to Uptempo that he is alleged to have done to Intellipayment" | Farley | 05/15/2020 |
| "Michael Trimarco has even gone so far as to create spoof websites and corporate entities which mimic the name Uptempo, in a pitiful effort to make it appear as though he now controls the company.  But there are some significant differences between our company's situation and that of Intellipayment.  After learning about the Intellipayment allegations against Michael Trimarco last summer, Uptempo took steps to ensure that it would not be victimized by Michael Trimarco … When it comes to Uptempo, Mr. Trimarco has nothing but smoke and mirrors … Anyone being asked to do something on behalf of the Uptempo companies would be wise to do their own due diligence, and contact the undersigned to determine whether they have actual authority – or whether they have been tricked by a pretender in furtherance of a fraud.  You are each urged to proceed with caution" | Farley | 05/15/2020 |
| "we articulated Mr Trimaco's efforts to defraud in a series of indemnification notices sent to him and his former attorneys in April.  Since that time, Mr. Trimarco has continued to try to defraud the companies for his own benefit with very limited success.  The only real success he had was to steal the uptempo.net domain name from the company CEO's godaddy account (I never really cared for the .net address anyway).  Without limitation, these are some of the actions taken by Mr Trimarco over the last several months: He filed a series of false insurance claims on company policies … He attempted to procure and abscond with company PPP funds without authorization … Trimarco was stealing health insurance for himself from Uptempo and doing so at the expense of its employees.  That should tell you all you need to know about Michael Trimarco" | Farley | 09/17/2020 |

| | | |
|---|---|---|
| "Mr Trimarco has a pattern of fraud dating back to his involvement with Data Treasury Corp, Advanced Wellness, and Home Assure.  Don't take my word for it.  Please google Mr Trimarco's name with each broken business listed above.  Read what the judges write about Mr Trimarco.  There is ample public evidence to show that Mr Trimarco simply moves from one fraud to the next.  Woe to anyone who gets into business with him.  When you have an understanding of those frauds perpetrated by Trimarco, take a close look at the Complaint in the 2018 Cavuoti/Intellipayment suit in the NY Supreme Court.  In that suit, Mr Trimarco is accused of doing to Mickey Cavuoti, the same thing that he is trying to do to our shareholders – steal the company for himself.  When I learned of the Cavuoti allegations against Trimarco in February, I was skeptical.  Over the last seven months, Mr Trimarco has shown me that I was wrong to be skeptical.  He is a con man – even more so than his brother Vincent Trimarco.  His intentions with respect to the insurance policies are not benign.  I firmly believe that he intends to defraud those carriers like he tried to defraud them over the summer.   Stepping back from him is a wise move" | Farley | 09/17/2020 |

As part of the scheme to destroy Trimarco's reputation so the Banks would not honor the GSA, David S. Brown ("Brown"), counsel for Uptempo, falsely advised shareholder service company Carta that "Michael Trimarco … has permanently disqualified himself as a director of the Uptempo group or as a member of any Committee of the Board, by reason of what our client views as a continuing course of multiple acts of bad faith, breach of fiduciary duties and deceptive practises aimed at destabilizing Uptempo's business".  Brown falsely represented to Carta that Plaintiff's business was acquired by Uptempo "in insolvency[7] and in complete disarray", and "has subsequently been

---

[7]      Brown knew his statements were false.  The parties to the APA valued the IPPI deal at $5,000,000.00.  Further, after the deal closed in April 2018, Uptempo raised equity in an amount over $3,000,000 USD.  Brown's statements were intended to convey the impression to Carta that Trimarco had mismanaged Plaintiff's business and that he was otherwise disreputable.

recapitalized in an amount in excess of CAD 6MM by Canadian investors (who at this stage control by far the voting interests)".[8]   Until February 2020, MCB swept and transferred all monies earned by UMC (Collateral) into an operating account at TD.  Prior to February 2020, Trimarco, as an officer and director on behalf of UMC and as an officer and direction on behalf of the Secured Party, controlled and directed all disbursements of UMC's funds in the ordinary course of business.  Both MCB and TD recognized Trimarco and Plaintiff as the beneficial owner of UMC's accounts in accordance with 31 C.F.R. 1010.230 (Beneficial Ownership Requirements for Legal Entity Customers) and the Department of the Treasury FINCEN Customer Due Diligence ("CDD")   Rule.   [https://www.fincen.gov/resources/statutes-and-regulations/cdd-final-rule].  Everything changed with the defamatory letters and emails from the Uptempo Defendants.  In spite of the beneficial ownership and CDD Rules and in spite of the GSA, Plaintiff's perfected first priority security interest, and an established course of dealing and performance that spanned many years, MCB suddenly refused lawful direction from Plaintiff and Trimarco concerning the Collateral.  Acting upon instruction and direction from the Uptempo Defendants and their agents, and in spite of notice of Plaintiff's security interest, MCB began to transfer Collateral to accounts identified and controlled by the Uptempo Defendants, avoiding Plaintiff's security interests and impeding enforcement of the Note, Unconditional Guaranty and GSA.  The defamation effectively stripped Plaintiff of its rights and interests in the Collateral and under the GSA to act as attorney-in-fact for UMC.

---

[8]     Indeed, Plaintiff was the beneficial owner of Uptempo, owning 61.42 percent of the company.

c.     Farley used his father[9] and his father's contacts at the Federal Bureau of Investigation ("FBI") to spread false and defamatory statements about Trimarco, and to give the scheme an air of legitimacy.  The putative involvement of the FBI further impaired Plaintiff's security.

d.     The Uptempo Defendants denied Plaintiff the right to inspect and verify the Collateral, changed the location of the Collateral from TD to other banks, and denied Plaintiff the right to access and take possession of the Collateral.  Plaintiff learned that Hilmer, Cicolini and Carden had opened new accounts at SunTrust.  When Plaintiff alerted SunTrust about the situation, SunTrust closed the accounts, and Hilmer, Cicolini and Carden moved the money again.  In a clear effort to evade and frustrate the GSA, the Uptempo Defendants opened accounts in the name of TCCI and concealed the location of the Collateral.  They have employed active measures to deceive Plaintiff, including changing UMC's agreed banking resolutions without authority to prohibit Plaintiff and Trimarco from accessing banking records and the Collateral.  On new banking resolutions, Cicolini and Hilmer intentionally misrepresented that Trimarco was not an officer and director of UMC.  Cicolini and Hilmer also misrepresented that Cicolini was a shareholder of Uptempo and concealed Plaintiff's beneficial ownership of Uptempo.[10]

e.     The Uptempo Defendants took over control of UMC's cloud hosting providers and hardware and software systems (Microsoft Azure) – which are part of Plaintiff's Collateral.

---

[9]     Farley's father is Dick Farley, is a retried special agent with the FBI. [https://www.linkedin.com/in/dick-farley-b0496017/].

[10]     The Uptempo Defendants illegally set up shadow bank accounts to hide UMC's monies and property from Plaintiff.

f.      The Uptempo Defendants misrepresented to the United States Small Business Administration ("SBA") and others that Trimarco had taken part of the proceeds of Covid relief loans obtained by UMC.  The lies were provably false. Trimarco did not take any of the money.  The loan proceeds (Collateral) remain in an account at TD today.  TD froze the account and refuses to provide Plaintiff with access to the Collateral as a result of the Uptempo Defendants' actions.  The Uptempo Defendants' actions were calculated to hide their conversion of Collateral and UMC's hardware & software systems that run the billions in transactions and client/customer business that is an integral part of the Collateral and business of UMC.

g.      The Uptempo Defendants advised TD & American Express to reverse debit payments and initiate fraud investigations of Trimarco.

h.      Starting in or about May 2020, the Uptempo Defendants stopped using ADP as UMC's payroll processor, and moved UMC's payroll money away from TD and ADP, where it was run for 4 years.  The Uptempo Defendants moved certain of UMC's employees onto TCCI's payroll,[11] and paid them directly via ACH through priority pay without providing pay stubs etc.  The Uptempo Defendants closed and transferred all banking, employee payments, benefits, and software to accounts away from UMC and USC and into the name of TCCI in order to avoid the GSA and to prevent Plaintiff from enforcing its security interests in the Collateral.

36.      Once the Uptempo Defendants effectively dispossessed UMC of its assets, they entered into one or more agreements with a Canadian penny stock company known

---

[11]      The Uptempo Defendants out of spite closed UMC's Oxford group health plan (that covered business employees for over a decade) and moved coverage for select employees to Aetna.  Trimarco's health care was terminated while his wife was expecting a baby.  Trimarco was not even offered COBRA.

as, "Nobelium Tech Corp." ("Nobelium"),[12] to complete a "reverse takeover transaction" (the "Hank Transaction") pursuant to which Nobelium intends to complete a "three-cornered amalgamation" with Hank.

37.     A special meeting the shareholders of Nobelium was scheduled to take place on March 26, 2021 to vote on the Hank Transaction.  If the Hank Transaction is approved, Hank (and all the assets owned by and formerly in the name of UMC) will be merged into Nobelium.  Nobelium intends to change its name to "Hank Payments, Inc." If the Hank Transaction is approved, Hilmer will become the CEO and a Director of the new "Hank Payments, Inc."  Plaintiff's property rights and security interest will be wiped out.

38.     The total sum (Principal and Interest) due and payable to Plaintiff by UMC and Uptempo under the Note and Unconditional Guaranty as of April 8, 2020 was $1,310,564.38 plus attorneys' fees.  Between April 8, 2020 and the present, Plaintiff incurred substantial additional attorney's fees.

**COUNT I**

**<ins>BREACH OF THE NOTE</ins>**

**(UMC)**

39.     Plaintiff restates paragraphs 1 through 38 of this Complaint, and incorporates them herein by reference.

40.     The Note and GSA are valid and enforceable contracts.

---

[12]     Nobelium is a capital pool company headquartered in Halifax, Nova Scotia, Canada.  Nobelium trades on the TSX Ventures Exchange market in Canada under the ticker symbol "NBL.H".  The stock currently trades on no volume at $0.09 per share. [https://www.marketwatch.com/investing/stock/nbl.h?countrycode=ca].

41.     UMC breached its obligations under the Note and GSA.  Despite demand, UMC failed to pay Plaintiff all sums due under the Note and GSA.

42.     As a direct result of UMC's breach of contract, Plaintiff suffered damage in the sum of $1,310,564.38, plus attorney's fees, costs, and other amounts due and payable under the Note and/or GSA.

## COUNT II

### BREACH OF THE UNCONDITIONAL GUARANTY

**(Uptempo)**

43.     Plaintiff restates paragraphs 1 through 42 of this Complaint, and incorporates them herein by reference.

44.     The Unconditional Guaranty is a valid and enforceable contract.

45.     Uptempo unconditionally guaranteed all of UMC's payment obligations under the Note.  UMC failed to pay Plaintiff all sums due under the Note.  Despite demand, Uptempo failed to pay all sums due to Plaintiff under the Note.

46.     As a direct result of Uptempo's breach of contract, Plaintiff suffered damage in the sum of $1,310,564.38, plus attorney's fees, costs, and other amounts due and payable under the Note and Unconditional Guaranty.

## COUNT III

### TORTIOUS INTERFERENCE WITH CONTRACT

**(Uptempo, USC, and Hank/TCCI)**

47.     Plaintiff restates paragraphs 1 through 46 of this Complaint, and incorporates them herein by reference.

48.     The Note, Unconditional Guaranty and GSA are valid and enforceable contracts.

49.     At the time the Uptempo Defendants unlawfully interfered with the Note, Unconditional Guaranty and GSA, Plaintiff had existing property rights in and reasonable business expectancies under its contracts with UMC.

50.     The Uptempo Defendants knew about the Note, GSA and the UCC1s, and Plaintiff's reasonable business expectations under these instruments.

51.     The Uptempo Defendants intentionally interfered with Plaintiff's contracts, property rights and business expectancies by devising, implementing, aiding, abetting and actively participating in the scheme to breach the Note, Unconditional Guaranty and GSA, to convert Plaintiff's security interests, to fraudulently transfer Collateral, to prevent performance of the Note and GSA, and to deprive Plaintiff of its rights and interests under the contracts and the UCC, including possession of the Collateral.

52.     The Uptempo Defendants employed methods of interference that were independently tortious, defamatory, unethical, oppressive, over-reaching, fraudulent, dishonest, unfair, hostile, sharp, and criminal.   The interference was completely unjustified.

53.     As a direct result of the Uptempo Defendants' tortious interference with contract and business expectancies, Plaintiff suffered actual damage and loss, including injury occasioned by UMC's repudiation and breach of the Note and GSA and impairment of Plaintiff's Collateral, in a total sum to be determined by the Jury.

54.     The Uptempo Defendants' actions were motivated by spite, ill-will and a desire to hurt Plaintiff.  Plaintiff seeks punitive damages in the amount of $10,000,000.00 or such greater sum as is determined by the Jury.

## COUNT IV

## <u>CONVERSION</u>

### (Uptempo, USC and Hank/TCCI)

55.     Plaintiff restates paragraphs 1 through 54 of this Complaint, and incorporates them herein by reference.

56.     At all times relevant to this action, Plaintiff had a clear, definite, undisputed and obvious property right in and to its security interests in the Collateral, to which Plaintiff was entitled to immediate possession.

57.     The Uptempo Defendants wrongfully exercised and assumed authority over Plaintiff's personal property, depriving Plaintiff of possession.  The Uptempo Defendants wrongfully exerted dominion over property in which Plaintiff has an interest in denial of and inconsistent with Plaintiff's rights and interests.

58.     The Uptempo Defendants' actions constitute the tort of conversion.

59.     As a direct result of the Uptempo Defendants' conversion of Plaintiff's security interests, Plaintiff suffered actual damage and loss, including impairment of its security under the GSA and loss of Collateral, in a total sum to be determined by the Jury.

60.     The Uptempo Defendants knowingly and willfully converted Plaintiff's security interests in UMC's Collateral, and have acted under circumstances amounting to a willful and wanton disregard of Plaintiff's rights and interests.  Their actions were

motivated by spite, ill-will and a desire to hurt Plaintiff.  Plaintiff seeks punitive damages in the amount of $10,000,000.00 or such greater sum as is determined by the Jury.

**COUNT V**

**FRAUDULENT TRANSFERS – DCL § 273**

**(UMC, Uptempo, USC and Hank/TCCI)**

61.     Plaintiff restates paragraphs 1 through 60 of this Complaint, and incorporates them herein by reference.

62.     At all times relevant to this action, Plaintiff was a creditor of UMC and Uptempo by reason of UMC and Uptempo's execution of the Note, Unconditional Guaranty and GSA.

63.     Between February 2020 and the present, UMC, acting at the direction of Uptempo, USC, Hank/TCCI, Farley, Hilmer, Cicolini and Carden, made or directed transfers of UMC's monies and property from one or more accounts at MCB to accounts controlled by Uptempo, USC, Hank/TCCI, Hilmer, Cicolini and Carden with the specific intent to hinder, delay or defraud Plaintiff and to avoid Plaintiff's lien on UMC's Collateral.   Numerous badges of fraud accompany these transfers.   UMC secretly changed the location of the Collateral accounts without notice or authority, and concealed the location of its assets and made them inaccessible to Plaintiff.  UMC transferred funds to one or more insiders to avoid paying Plaintiff.  The transfers were concealed.  UMC retained possession, benefit and use of the property after the transfers.  UMC, Uptempo, USC,  Farley, Hilmer, Cicolini, Carden and MCB refuse to communicate with Plaintiff or Trimarco about the transfers.  Before the transfers were made, Plaintiff made demand on UMC and threatened it with suit.  At the time of the transfers, UMC was insolvent.

64.     UMC's conveyances are voidable under DCL § 273.

65.     After transferring UMC's funds, Uptempo, USC and Hank/TCCI spent or dissipated the property conveyed.   Accordingly, Plaintiffs seeks a money judgment against Uptempo, USC and Hank/TCCI pursuant to CPLR § 5225(b).

**COUNT VI**

**DECLARATORY JUDGMENT AND FRAUDULENT TRANSFERS – DCL § 273**

**(Uptempo)**

66.     Plaintiff restates paragraphs 1 through 65 of this Complaint, and incorporates them herein by reference.

67.     Pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Rules 8(a) and 57 of the Federal Rules of Civil Procedure, Plaintiff requests the Court to enter a declaratory judgment fixing the number of shares and Plaintiff's percentage ownership of Uptempo.

68.     Before they signed the APA in April 2018, Hilmer, Cicolini, Jason Ewart ("Ewart") and others devised a scheme to change the articles and by-laws of Uptempo to facilitate issuance of Uptempo securities to themselves and to "friends & family" without Plaintiff's or Trimarco's knowledge.   After changing Uptempo's articles and by-laws, Hilmer, Cicolini and Ewart then proceeded to engage in a series of unregistered, private securities transactions that had the direct effect of diluting Plaintiff's ownership of Uptempo.   Uptempo is a valuable ongoing concern.   The purpose and effect of Uptempo's deceit was to injure and diminish the value of Plaintiff's shares in Uptempo and to deprive Plaintiff of beneficial owners and control of Uptempo.

69.     At the time Uptempo signed the APA, the articles of Uptempo contained a clear restriction on shares transfers:

---

Schedule / Annexe

Restrictions on Share Transfers / Restrictions sur le transfert des actions

No shares of the Corporation shall be transferred without either:

(a)        the consent of the directors of the Corporation expressed by a resolution passed by a majority of the board of directors
or by an instrument or instruments in writing signed by all of the directors then in office, or

(b)        the consent of the majority of the shareholders of the Corporation expressed by a resolution passed by a majority of the
shareholders or by an instrument or instruments in writing signed by all of the shareholders entitled to vote on such a
resolution.

---

Section 11.6 of the by-laws of Uptempo further stated that no securities of the corporation, other than non-convertible debt securities, "shall be transferred by any security holder of the Corporation" without either:

---

(i)     the approval of the directors of the Corporation expressed by resolution passed by the votes cast by a majority of the directors of the Corporation at a meeting of the board of directors or a signed by all of the directors of the Corporation; or

(ii)    the shareholders of the Corporation expressed by resolution passed by the votes cast by a majority of the shareholders who voted in respect of the resolution or signed by all shareholders entitled to vote on that resolution.

---

Section 11.7 of the by-laws provided that:

---

11.7   **Security Holders**

(i)     The number of security holders that beneficially own, directly or indirectly, securities of the Corporation, other than non-convertible debt securities, is limited to 50, not including employees or former employees of the Corporation or its affiliates, provided that each person is counted as one beneficial owner unless the person is created or used solely to purchase or hold securities of the Corporation in which case each beneficial owner or each beneficiary of the person, as the case may be, must be counted as a separate beneficial owner.

(ii)    The Corporation may only distribute its securities, other than non-convertible debt securities, to persons described in Section 2.4 of National Instrument 45-106 – Prospectus Exemptions, as promulgated by the Canadian Securities Administrators, as the same may be amended, replaced or substituted for from time to time.

---

The by-laws of Uptempo further provided that no share of the corporation could be issued "until it is fully paid in money or in property or in past service that is not less in value than the fair equivalent of the money that the Corporation would have received if the share had been issued for money."

70.    On July 6, 2018, without calling a meeting of either the directors or shareholders and without a signed resolution of all directors or all shareholders, Hilmer and Cicolini, acting in concert with Ewart and others, unlawfully and fraudulently changed Uptempo's articles and by-laws.  Hilmer and Cicolini back-dated corporate resolutions to April 30, 2018 to make it look like the changes to the articles and by-laws were effective as of the date of closing of the APA.  Hilmer and Cicolini eliminated the restriction on share transfers in Uptempo's articles and eliminated §§ 11.6 and 11.7 of the by-laws, effectively giving Hilmer and Cicolini carte blanche to issue shares of Uptempo to whomever they wanted.  Hilmer and Cicolini concealed the illegal changes to Uptempo's articles and by-laws from Plaintiff and Trimarco.

71.    The putative changes to the articles and by-laws are illegal and void.

72.    Between April 2018 and November 27, 2018, Uptempo, acting at Hilmer and Cicolini's direction, made or directed transfers of its stock, options and other securities with the specific intent to hinder, delay or defraud Plaintiff and to avoid or frustrate enforcement of the Unconditional Guaranty by unlawfully diluting Plaintiff's percentage ownership of Uptempo.  Uptempo transferred stock, options and other securities to third-parties, including Hilmer, Hilmer's family, Hilmer's friends, and Cicolini, without receiving money, property or past service of fair equivalence or any reasonably equivalent value in exchange for the transfer.  At the time of the securities

transactions, Uptempo (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of Uptempo were unreasonably small in relation to the business or transaction; and (b) Uptempo intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

73.     Uptempo did not disclose the illegal securities transactions to Plaintiff until November 27, 2018.

74.     On November 27, 2018, Brown represented to then-counsel for Plaintiff, Tony Santos ("Santos"), that "IPPI currently owns 17,333,333 common shares of Uptempo.  The IPPI shares represented 61.42% of the total shareholdings of Uptempo as of the date of the closing of the APA.  The current shareholdings of IPPI represent the proportion of shares held by it after some dilution due to the issuance of shares under an equity financing … and the exercise of certain warrants and rights to convert debt securities into common stock."

75.     A certificate signed by Hilmer that was part of Brown's letter states as follows:

> Attached as Exhibit "E" is a copy of the capitalization table of the of the Corporation (the "**Cap Table**") which lists all of the current shareholders and holders of convertible debt of the Corporation and certain anticipated shareholders whose investments in the Corporation have not yet closed, but who have paid for their securities in full as of the date hereof. The Cap Table also illustrates the dilutive effect that the closing of the current and anticipated investments listed therein will have on the key shareholders of the Corporation. Except as set out on the Cap Table, there are no other current shareholders or holders of convertible debt of the Corporation

The "**Cap Table**" represents as follows:

**UPTEMPO INC.**
**Share capital**
**As at April 30, 2018 and November 5, 2018**

|  | April 30 |  | Current |  |  |
|---|---|---|---|---|---|
| **Founder shares** | # of shares | Ownership % | # of shares | Ownership % | Sch. |
| Mike Hilmer, friends & family | 7,850,000 | 18.65% | 7,850,000 | 15.6% | |
| Jason Ewart | 2,893,100 | 6.87% | 2,893,100 | 5.7% | |
| Gordon Ewart | 4,793,750 | 11.39% | 4,793,750 | 9.5% | |
| Chris Carmichael | 1,862,000 | 4.42% | 1,862,000 | 3.7% | |
| | 17,398,850 | 41.33% | 17,398,850 | 34.6% | |
| | | | | | |
| **Financing Warrants ($0.005)** | # of warrants | | # of warrants | | |
| Lenders | 1,200,650 | 2.85% | 1,200,650 | 2.4% | |
| | 1,200,650 | 2.85% | 1,200,650 | 2.4% | |
| | | | | | |
| **Acquisition of TCCI** | | | | | |
| Shawn Carden | 2,135,000 | 5.07% | 2,135,000 | 4.2% | |
| | 2,135,000 | | 2,135,000 | | |
| **Acquisition of IPPI** | | | | | |
| Mike Trimarco | 17,333,333 | 41.18% | 17,333,333 | 34.4% | |
| Dean Fournaris* | 1,517,400 | 3.60% | 1,517,400 | 3.0% | |
| Daniel Ducomb* | 282,405 | 0.67% | 282,405 | 0.6% | |
| Chris Cicolini | 2,100,000 | 4.99% | 2,100,000 | 4.2% | |
| Marie Lainhart* | 64,050 | 0.15% | 64,050 | 0.1% | |
| Imran Habib* | 64,050 | 0.15% | 64,050 | 0.1% | |
| | 21,361,238 | 50.74% | 21,361,238 | 42.4% | |
| | | | | | |
| Convertible debt financing @$0.47/0.57 ($2.0M) | - | 0.00% | 3,860,443 | 7.7% | A |
| Converted debt @ $0.47 (0.3M) | - | 0.00% | 695,207 | 1.4% | B |
| Financing @ $0.47 ($1.7M) | - | 0.00% | 3,702,239 | 7.4% | C |
| | - | 0.00% | 8,257,889 | 16.4% | |
| **Total** | 42,095,738 | 100.00% | 50,353,627 | 100.0% | |

* shares to be issued but should be included in the calculation

76.     Despite request, Uptempo refuses to supply any books and records related to the putative securities transactions, including the "anticipated" transactions.

77.     Uptempo also refuses to call a shareholder's meeting.  If they called a shareholder's meeting, they would have to identify the current shareholders of Uptempo, which they cannot do because the transactions are illegal.

78.     The "Founder's shares", "Financing warrants", shares conveyed to Cicolini, shares issued with an asterisk, and the transactions represented in Schedules A, B and C, identified on Hilmer's "**Cap Table**", were not authorized by Uptempo's board of directors or shareholders, and, upon information and belief, the transactions never

actually happened, *i.e.*, the shares were never actually bought and paid for.   These securities transactions are voidable under DCL § 273.

79.     There is an actual case and controversy between the parties.   Plaintiff seeks a declaratory judgment against Uptempo determining and fixing the number of shares and Plaintiff's percentage ownership of Uptempo.

80.     Pursuant to DCL §§ 276 and 276a, Plaintiff also seeks the following relief:

a.      Avoidance of the unlawful transfers;

b.      An injunction against further unlawful issuance of securities by Uptempo and disposition by Uptempo of its shares of UMC;

c.      Reasonable attorneys' fees.

## COUNT VII

## <u>FRAUDULENT TRANSFERS – DCL § 274</u>

### (Uptempo)

81.     Plaintiff restates paragraphs 1 through 80 of this Complaint, and incorporates them herein by reference.

82.     At all times relevant to this action, Plaintiff was a creditor of Uptempo by reason of Uptempo's execution of the Note and Unconditional Guaranty.

83.     Between April 2018 and November 27, 2018, Uptempo made or directed transfers of its stock, options and other securities without receiving a reasonably equivalent value in exchange for the transfer or obligation and at a time when Uptempo was insolvent or it became insolvent as a result of the transfers.   The securities transactions evidenced by Uptempo's "**Cap Table**" were, upon information and belief, made to insiders for an antecedent debt at a time when Uptempo was insolvent, and the

insiders, including Hilmer and Cicolini, had reasonable cause to believe that Uptempo was insolvent.

84.     The "Founder's shares", "Financing warrants", shares conveyed to Cicolini, shares issued with an asterisk, and the transactions represented in Schedules A, B and C, identified on the "**Cap Table**", are voidable under DCL § 274.

85.     Pursuant to DCL §§ 276 and 276a, Plaintiff seeks the following relief:

      a.     Avoidance of the transfers;

      b.     An injunction against further unlawful issuance of securities by Uptempo and disposition by Uptempo of its shares of UMC;

      c.     Reasonable attorneys' fees.

## COUNT VIII

## AIDING AND ABETTING

### (TSC and Hank/TCCI)

86.     Plaintiff restates paragraphs 1 through 85 of this Complaint, and incorporates them herein by reference.

87.     By their actions described above, USC and Hank/TCCI actively and substantially participated in and facilitated UMC and Uptempo breaches of the Note, Unconditional Guaranty and the GSA, interference with Plaintiff's contracts, conversion of Plaintiff's security interests, and fraudulent transfers.

88.     As a result of their conduct, USC and Hank/TCCI are jointly liable for UMC and Uptempo's breaches of contract, tortious interference, conversion of Plaintiff's security interests and fraudulent transfers in an amount to be determined by the Jury.

## COUNT IX

## TEMPORARY AND PERMANENT INJUNCTION

### (UMC, Uptempo, USC and Hank/TCCI)

89.     Plaintiff restates paragraphs 1 through 88 of this Complaint, and incorporates them herein by reference.

90.     In order to protect Plaintiff's property rights and interests, Plaintiff seeks a temporary restraining order and permanent injunction prohibiting the Uptempo Defendants from proceeding to merge the assets of UMC into Nobelium.

91.     The announced merger between Nobelium and Hank poses an imminent threat of irreparable harm to Plaintiff's valuable rights and interests in UMC's property for which Plaintiff has no adequate remedy at law.  Nobelium is a Canadian company. The Collateral is Plaintiff's only source of security for payment of the substantial sums owed by UMC and Uptempo.  The merger of Nobelium and Hank will render UMC and Uptempo empty shells[13] and will effectively extinguish Plaintiff's contracts and security, forcing Plaintiff to sue Nobelium in Canada and pursue whatever remedies are available there.  A temporary injunction would avoid a multiplicity of lawsuits.  Without Court intervention and an injunction, Plaintiff will suffer actual and irreparable injury to its property rights interests.

92.     The Note and GSA are valid and enforceable contracts.  UMC and Uptempo are in breach of the Note, Unconditional Guaranty and GSA.  There is a substantial likelihood that Plaintiff will succeed on the merits of its claims or sufficiently serious questions going to the merits.

---

[13]     Uptempo's sole asset is its shares of UMC.

93.     Plaintiff requests the Court to issue a temporary injunction to maintain the status quo while this litigation is pending.  The balance of the hardships tips decidedly in Plaintiff's favor, and warrants an equitable remedy that would fully serve the public interest and preserve the Court's ability to render a meaningful decision on the merits.

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession.  Plaintiff believes that substantial additional evidentiary support, which is in the exclusive possession of the Defendants, their agents, surrogates, alter egos, and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Plaintiff reserves the right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to enter Judgment against Defendants, jointly and severally, as follows:

A.      Compensatory damages in the amount of $5,000,000.00;

B.      Punitive damages in the amount of $10,000,000.00 or the maximum amount allowed by law;

C.      Prejudgment interest on the principal sum awarded by the Jury pursuant to CPLR § 5001;

D.      Declaratory and Injunctive relief as prayed for above;

E.      Postjudgment interest at the maximum rate allowed by law;

F.       Reasonable attorneys' fees;

G.       Such other relief as is just and proper.

### TRIAL BY JURY IS DEMANDED

DATED:        April 7, 2021

INTELLIGENT PAYMENT PROCESSING INC.

By:    */s/ Joshua R. Bronstein*
      Joshua R. Bronstein (# 4178687)
      Joshua R. Bronstein & Associates, PLLC
      114 Soundview Drive
      Port Washington, NY 11050
      516-698-0202
      Jbrons5@yahoo.com

      Steven S. Biss (Virginia State Bar # 32972)
      300 West Main Street, Suite 102
      Charlottesville, Virginia 22903
      Telephone:  (804) 501-8272
      Facsimile:  (202) 318-4098
      Email:  stevenbiss@earthlink.net
      (*Motion for Admission Pro Hac Vice*
          *To be Filed*)

      *Counsel for the Plaintiff*